**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| SHAWNEE MISSION UNITARIAN UNIVERSALIST CHURCH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:19-cv-02719-DDC-GEB |
| | ) | |
| THE CITY OF LENEXA, KANSAS, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

Plaintiff Shawnee Mission Unitarian Universalist Church ("Shawnee Mission Church") hereby submits its Memorandum in Support of its Motion for Temporary Restraining Order or, in the alternative, a Preliminary Injunction.

## NATURE OF THE CASE

This case is about a church's calling to provide a welcoming refuge for those experiencing homelessness, and the City of Lenexa's unlawful obstruction of that mission through zoning in violation of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc – cc-5, the Kansas Preservation of Religious Freedom Act, the United States Constitution, and the Kansas Constitution.

Shawnee Mission Unitarian Universalist Church ("Shawnee Mission Church" or "Church") has a long and proud history of ministering to the poorest and most vulnerable populations of Lenexa, Kansas and the greater Johnson County area. Over the last several years, the Church has advanced their ministry by partnering with a number of non-profit programs to reach those in need. This year, Shawnee Mission Church expanded its commitment to serving the poor and vulnerable by welcoming Project 10/20 to partner with it to provide shelter to the most defenseless population in Johnson County during the depths of the cold and snowy Kansas winter, as there is a lack of available homeless shelters in Johnson County.

Prior to doing so, representatives of Shawnee Mission Church met with the Lenexa City Planner, City Code Inspector, City Fire Marshal, and City Fire Department, all of whom reviewed the proposal of the Church to partner with Project 10/20 on a temporary basis to shelter the homeless at the Church from December 1, 2019 through April 1, 2020. After the meeting, City officials told the Church's representatives that they believed the proposed ministry of housing the homeless was permitted under the zoning code. The following week, however, the Church received a letter from the Planning and Developmental Services Administrator rejecting the needed shelter and closing the homeless ministry of the Church. Upon further inquiry with the City, the City Manager told the Church that she, alone, made the decision to deny the Church the ability to fulfill

its religious mission to house the homeless this winter. The cruelty of the decision is based on the City of Lenexa's deliberate exclusion of homeless shelters in all zoning districts within its jurisdiction.

Plaintiff Shawnee Mission is asking this Court for an immediate Temporary Restraining Order or, in the alternative, Preliminary Injunction allowing it to fully exercise its religious mission to house the homeless on its property, on a temporary basis from December 1, 2019 through April 1, 2020, pursuant to the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc and the U.S. Constitution.

## STATEMENT OF QUESTION PRESENTED

Is immediate injunctive relief necessary to keep Defendant from causing any further irreparable harm to Shawnee Mission Church by inhibiting the Church's ability to exercise its religious mission to temporarily house the homeless this winter?

The answer is **Yes.**

## CONCISE STATEMENT OF KEY FACTS

The facts upon which this motion is brought are more fully set forth in the verified complaint and exhibits thereto. For purposes of this motion, the central facts are set forth below:

1.     Shawnee Mission Unitarian Universalist Church is a religious institution and nonprofit corporation organized under the laws of the State of Kansas, with its principal place of business located and maintained at 9400 Pflumm Road in the City of Lenexa, the County of Johnson and the State of Kansas.  ***Plaintiff's Verified Complaint, Para. 1***.

2.     Defendant City of Lenexa, Kansas is a political subdivision located in Johnson County, Kansas and chartered by Kansas law, which, for purposes of RLUIPA and the Kansas

Preservation of Religious Freedom Act, constitutes a "government."   42 U.S.C. § 2000cc-5(4)(A)(i)-(ii); Kan. Stat. Ann. § 60-5303(a); *Plaintiff's Verified Complaint, Para. 2.*

3.     Shawnee Mission Unitarian Universalist Church is a religious community of people engaged in worship and the celebration of life, personal and intellectual growth, caring and supportive fellowship, humanitarian service and social action. Charity and service to those in need are integral parts of the Unitarian Universalist denomination. Its social mission is based on biblical principles, such as, *"Vindicate the weak and fatherless. Do justice to the afflicted and destitute. Rescue the weak and needy. Deliver them out of the hand of the wicked.*" Psalm 82:3-4.  *Exhibit A, Dec. of Pastor Rose Schwab, paras. 4, 5.*

4.     Continuously since its founding, Shawnee Mission Church has been a vibrant place of worship, growth, and service to the purposes of God in the region. Church members have lived out Jesus' command to "Go into all the world" through local mission and outreach opportunities, including serving Johnson County homeless residents and participating with Project 10/20 to minister to the homeless in the local area. Shawnee Mission Church perceives its physical location to be a tool that God has provided to allow the congregation to accomplish the mission God put into their hearts; that is, to build a company of people to go and share the Good News of Jesus Christ.  The position taken by Shawnee Mission Church is consistent with many other UUA churches throughout the United States.  *Exhibit A, paras. 6, 9, 13.*

5.     In addition to weekly religious services, Shawnee Mission Church uses the property for weekly bible study, social groups, and allows outside groups – such as the Boy Scouts of America, Recovery Groups, Japanese School, and other groups to use its many classrooms for community events and affairs.  All of the uses are accessory to and part of the religious mission of the Church. *Exhibit A, para 16.*

6.     The City of Lenexa adopted a zoning code which governs land use and zoning within the City. See, ***Exhibit B***, generally Lenexa Zoning Code. The Code contains three (3) zoning classifications (Residential, Nonresidential and Special Purpose) with a combined twenty two (22) zoning districts. ***Exhibit B***, p. 5.  None of the Zoning Districts allow for homeless shelters as an approved use or conditional use. ***Exhibit B; Exhibit C,*** Statement of Beccy Yocham, Lenexa City Manager, Flatland Kansas City News, October 28, 2019.

7.     The Church is located in the Residential zone – which allows overnight stay - in which the following uses are permitted:

    i.   *Residential Uses:* Single Family homes, Manufactured Homes

    ii.  *Public or Civic Uses:*

        1.  ***Churches or places of worship***, subject to the supplementary use regulations of Section 4-1-b-23-R of the Code;

        2.  ***Day care,*** limited, subject to the Code; supplementary use regulations of Section 4-1-b-23-E of the Code, Group Home, limited.

        3.  ***Public Park,*** subject to the supplementary use regulations of Section 4-1-b-23-X of the Code.

See, ***Exhibit B***, Section 4-1-B-6 and RP-1.

8.     The subject property, formerly an elementary school, is located at 9400 Pflumm Road, Lenexa, Kansas ("Property"). The Church Property is surrounded by office, retail, commercial and industrial uses. See, ***Exhibit D***, Google Map.  As shown in ***Exhibit D***:

    a.  To the South of the Church is a large empty field adjacent to Crown Lift Trucks and offices for Catapult International, Barber Financial and American Family Insurance;

    b.  To the East of the Church is the Lenexa Masonic Lodge 135, Lenexa Community Center; Lenexa Senior Center, Carter's Antiques, Alterations by Heidi, Autism from the Start *(all in former residential homes)* and the Cat Clinic of Johnson County;

    c.  To the North of the Church is a rail line; Jerry's Bait Shop, and Lenexa Smoke store;

    d.  To the West of the Church is a dual train line, a large field, and Santa Fe Trail Drive.



    9.    At the present time, there are no homeless shelters for single male adults in Johnson County; there is one shelter with four (4) beds for homeless single adult women. Last year, between December 1, 2018 and April 1, 2019, there were 240 homeless individuals in Johnson County served by a temporary housing group called Project 10/20 – and there were 189 homeless adults in Johnson County in an official count conducted in January 2019. See, ***Exhibit C; see also Exhibit A***, paras. 17, 19.

10. City Manager Yocham recognized the need for homeless shelters in Lenexa, stating to the press, *"I absolutely know that there is a need"* for a homeless shelter. *Exhibit C.*

11. Senior Pastor Rose Schwab of Shawnee Mission Church attested that she is aware of an increase of people asking her for help as they are either homeless, home insecure (meaning, will be homeless soon), and has been personally asked by people who live in Johnson County for financial, grocery, medical and housing support. *Exhibit A, para. 20.*

12. On October 8, 2019, Matthew Clark, a Shawnee Mission congregant and employee of Johnson County Mental Health who works with the homeless, met with the Board of Directors of Shawnee Mission Church and asked if the Church would be willing to partner with Project 10/20 (a nonprofit group which provides temporary housing to the homeless) for the winter of 2019-2020 to house up to forty homeless individuals because there is no other place in the County for the homeless to go. *Exhibit A, para. 21; Exhibit E, Gail Robertson Declaration, para. 8.*

13. After prayerfully considering the proposal in light of its guiding principles of recognizing the "inherent worth and dignity of every person," and as the proposal to house the homeless is consistent with the ministry and core values of Shawnee Mission Church, the Board of Shawnee Mission Church approved the request to house the homeless from December 2019 through April 1, 2020 subject to the approval of the City Fire Marshal. *Exhibit E, para. 9.*

14. Other than the Church, there is no other shelter and no "Plan B," for homeless adults in Johnson County, Kansas. *Exhibit A, para. 36; Exhibit E, para. 20, 21.*

15. Shawnee Mission Church considers the use of its building for housing the homeless to be central to its sincerely held religious beliefs, and the denial of the use of its building for use as a temporary homeless shelter is, to Shawnee Mission Church, a substantial burden to its sincerely held religious beliefs. *Exhibit A, para. 6, 8, 9, 12, 13, 24, 37, 38; Exhibit E, para. 23.*

16.     On October 14, 2019 at 2:30 pm, Rev. Rose Schwab, Senior Pastor of Shawnee Mission Church, along with Jay Hetz, Church Sexton; Mike Monthey, Rental Committee; Matthew Clark, Shawnee Mission congregant and employee of Johnson County Mental Health; and Randy Burge, Church Treasurer (as well as Barb McEver, Jim Schmidt, and Cathy Goodman from Project 10/20, and Valerie Carlson from Johnson United Community Services) met with Andrew "Butch" Diekemper, City Fire Marshal; Magi Tilton, City Planning Director; Matt Souders, Community Development, Building Code Division; and Dave Little and Dave Biles from the Fire Department, at the Lenexa City Hall for one hour to discuss the proposal of Shawnee Mission Church to house up to forty homeless people from 7:00 p.m. to 7:00 a.m. at the Church from December 1, 2019 through April 1, 2020. *Exhibit A, para. 25.*

17.     The representative from Project 10/20 informed representatives of the City how the homeless shelter program worked and what was required from the Church. Representatives from the City asked several questions concerning how the program is implemented and its impact on the surrounding area. *Exhibit A, para. 26.*

18.     Shawnee Mission Church agreed to implement the policies and procedures of Project 10/20 with respect to housing the homeless on its property.  See, *Exhibit F*, Project 10/20's policies and procedures.

19.     At the conclusion of the meeting, Matt Souders from the Community Development, Building Code Division, told the meeting attendees that he believed that the proposed use of the property met all of the City Building Code requirements and there would be no code issues with the proposal to house the homeless on a temporary basis from December through April.  *Exhibit A, para. 27.*

20.     Thereafter, Magi Tilton, the City Planner, informed the meeting attendees that she considered the Homeless Ministry an "accessory use," to the religious use of the Property and would approve the use. *Exhibit A, para. 28.*

21.     A few days later, however, the Church received a letter from City Planning Director Magi Tilton advising it that the proposed use was not going to be approved as the use was "inconsistent" with the residentially zoned area. *Exhibit A, para. 29; Exhibit G, final denial letter.*

22.     Thereafter, the Church contacted the City and requested a second meeting to discuss the letter and the sudden about face with respect to the denial of the use. *Exhibit A, para. 31.* The meeting occurred on November 5, 2019 at 4:00 p.m. at the Lenexa City Hall between Reverend Rose Schwab, Senior Pastor of Shawnee Mission Church; Gail Robertson, Board President; Nancy Mays, former Board President of the Church; Dale Trott, President elect of the Board; Barb McEver and Jim Schmidt from Project 10/20, and Beccy Yocham, City of Lenexa City Manager; Maggie Tilton, City Planner; and Sean McLaughlin, Assistant City Attorney for the City of Lenexa. *Exhibit A, para. 32.*

23.     During the course of the November 5, 2019 meeting, representatives from the Church and Project 10/20 inquired with the representatives of the City as to why they changed their position from the meeting of October 14, 2019. City Manager Beccy Yocham, who did not attend the first meeting, responded and acknowledged that the lack of housing for the homeless was a problem, but it was her sole determination that housing the homeless at the Church would not be approved as an accessory use to the Church. *Exhibit A, para. 33.*

24.     When asked if the building could be used for emergency shelter for a tornado or other weather or civic events, City Manager Yocham agreed that it could be used for those

situations but again insisted that the use of the Property for a "homeless shelter" was not permitted in Lenexa, Kansas. ***Exhibit A,*** *para. 34;* ***Exhibit E****, para. 17, 18.*

25.     Representative of the Church then attempted to suggest various limitations on the use of the Property as a homeless shelter. However, the City Manager rejected every proposal from the Church and simply stated that the City would never allow the Church to be used for a homeless shelter. ***Exhibit A,*** *para. 35;* ***Exhibit E,*** *para. 19, 20.*

26.     As a result of Ms. Tilton and Ms. Yocham's final denial of Shawnee Mission Church's request, the Church is barred from using its Property for its religious ministry of housing the homeless, which has substantially burdened the religious exercise of the Church. ***Exhibit A,*** *para. 37;* ***Exhibit E,*** *para. 23.*

27.     The weather continues to freeze every night and nearly 200 people will needlessly suffer and likely be harmed by the illegal denial of the rights of Shawnee Mission Church to use its property to house the homeless. ***Exhibit H,*** *Kansas City Star Article, Nov. 18, 2019;* ***Exhibit A,*** *para. 36;* ***Exhibit E,*** *para. 21.*

## LEGAL ARGUMENTS

### A.  *Standard of Review for a Temporary Restraining Order and Preliminary Injunction*

The issuance of a temporary restraining order or other preliminary injunctive relief is within the sound discretion of the district court. *Sac & Fox Nation v LaFaver*, 905 F. Supp 904, 906 (D. Kan. 1995). To obtain a temporary restraining order or a preliminary injunction in federal court, the movant has the burden of establishing that

> (1) the party will suffer irreparable injury unless the injunction issues; (2) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood that the moving party will eventually prevail on the merits. *Id*.

1.      **Substantial Likelihood of Success on the Merits**.

To demonstrate a substantial likelihood of success on the merits of its claim, a plaintiff is required "to present a prima facie case showing a reasonable probability that [it] will ultimately be entitled to the relief sought." *Autoskill v. Nat'l Educ. Support Sys.*, 994 F.2d 1476, 1487 (10th Cir.1993). The movant is not required to show there is an "absolute certainty" that it will prevail on the merits. *Autoskill*, 994 F. 2d at 1487. Nor is it required to show an "overwhelming likelihood" of success. *Koerpel v. Heckler*, 797 F. 2d 858, 867 n. 5 (10th Cir. 1986). As mentioned above, the movant's burden of showing a likelihood of success on the merits is modified if it establishes that the factors of irreparable harm, balancing of hardships, and the public interest tip strongly in its favor; if so, the movant may satisfy the likelihood of success on the merits factor by showing "that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Davis v. Mineta*, 302 F. 3d 1104, 1111 (10th Cir. 2002). [1]

i.      ***Shawnee Mission Church has a Substantial Likelihood of Success on the Merits on its RLUIPA Substantial Burden Claim***

Shawnee Mission Church's use of its building for a homeless shelter is a religious exercise under RLUIPA and the inability to use it based on the Zoning decision of the City of Lenexa is a substantial burden on the Free Exercise of Religion of the Church.

Congress adopted RLUIPA in response to "massive evidence" that churches are "frequently discriminated against *on the face of zoning codes* and also in the highly individualized

---

[1] For the sake of briefing space, Shawnee Mission Church moves only with respect to the claims referenced below. Shawnee Mission Church believes it is likely to succeed on the remaining claims set forth in its Complaint and reserves all rights and remedies with respect to such claims.

and discretionary processes of land use regulation." *See Freedom Baptist Church of Delaware County v. Township of Middletown*, 204 F.Supp.2d 857, 862 (E.D. Pa. 2002) (quoting from Joint Statement of Sen. Hatch and Sen. Kennedy, 146 Cong. Rec. S7774-01, Ex. 1 (Jul. 27, 2000)). Congress noted that one of the most frequent abuses involved municipalities prohibiting or limiting churches in places where theaters, meeting halls, and other places where people may assemble for secular purposes are freely permitted. *Id*. at 862-63 (quoting from the Joint Statement). And under the First Amendment, when government forbids where people may worship it must have a strong and overriding reason for doing so. *See Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531-532 (1993); *see also Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 67-74 (1981) ("when a zoning law infringes upon a protected liberty, it must be narrowly drawn and must further a sufficiently substantial government interest.").

Congress enacted RLUIPA in order to provide "very broad protection for religious liberty." *Holt v. Hobbs*, 135 S. Ct. 853, 859 (2015) (quoting *Burwell v. Hobby Lobby Stores*, 134 S. Ct. 2751 (2014)); *see also Cutter v. Wilkinson*, 544 U.S. 709, 714-15 (2005). RLUIPA provides "greater protection for religious exercise than is available under the First Amendment." *Holt*, 135 S. Ct. at 860. As RLUIPA's co-sponsors, Senators Kennedy and Hatch observed:

> The right to assemble for worship is at the very core of the free exercise of religion. Churches and synagogues cannot function without a physical space adequate to their needs and consistent with their theological requirements. The right to build, buy, or rent such a space is an indispensable adjunct of the core First Amendment right to assemble for religious purposes.

146 Cong. Rec. S7,774-01 (daily ed. July 27, 2000).

RLUIPA's "Substantial burdens" subsection specifies:

> No government shall impose or implement a land use regulation *in a manner* that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—

  (A) is in furtherance of a compelling governmental interest; and

  (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. 2000cc(a)(1).

   This subsection applies in any case wherein the burden on religious exercise is imposed in a "system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved." 42 U.S.C. § 2000cc(a)(2). If the religious land use plaintiff can show that a land use regulation has been imposed in a manner that substantially burdens its religious exercise, then the burden shifts to the government to show the burden furthers a compelling government interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc-2(b).

     *ii.*   *Shawnee Mission's proposed use to house the homeless falls within RLUIPA's broad definition of "religious exercise."*

   RLUIPA broadly defines "religious exercise" to include "*any* exercise of religion, whether or not compelled by, or central to, a system of religious belief," and further specifies the "use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose." 42 U.S.C. § 2000cc-5(7). Whether an activity falls under this definition is a question of fact for the trier of fact. *See Chabad Lubavitch of Litchfield Cty. v. Borough of Litchfield*, 2017 U.S. Dist. LEXIS 181656, at *52 (D. Conn. Nov. 1, 2017) (describing inquiry as necessarily "fact-intensive"). The validity of what a plaintiff believes "cannot be questioned," but instead courts are asked to examine if its beliefs are "sincerely held" and rooted in religious belief. *United States v. Seeger*, 380 U.S. 163, 185 (1965); *see also Wisconsin v. Yoder*, 406 U.S. 205, 215–16 (1972).

Here, Shawnee Mission Church has exercised its religious beliefs through its charitable mission of ministering to the poorest and most vulnerable populations and desires to use its building to continue doing so. Shawnee Mission Church's belief in its calling to serve and minister to the needy is sincerely-held, as demonstrated by its continued commitment to its mission, and it is one of the tenets of its religion.

It is firmly established in law that homeless ministries fall within the wide scope of religious exercise under RLUIPA. *See First Lutheran Church v. The City of St. Paul*, Case No. 0:18-cv-00954-JRT-KMM (D. Minn. July 2, 2018) (partnering with a nonprofit to provide homeless care is a religious exercise of the Church) (attached as ***Exhibit H***).

Accordingly, Shawnee Mission Church's use of its Property for a homeless ministry to provide overnight care is a "religious exercise" under RLUIPA.

### iii.    *The City's evaluation of the Homeless Ministry on the Church's Property is an individualized assessment.*

RLUIPA's "individualized assessment test" is a jurisdictional determination. *See Hollywood Community Synagogue, Inc. v. City of Hollywood,* 430 F.Supp.2d 1296 (S.D. Fla. 2006). The Court has jurisdiction over the City's alleged violation of RLUIPA only if the Church can show that the "burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes ... individualized assessments of the proposed uses for the property involved." 42 U.S.C. 2000cc(a)(2)(C).  Thus, an individualized assessment involves a "case-by-case evaluation of the proposed activity." *Midrash Sephardi, Inc. v. Town of Surfside,* 366 F. 3rd 1214, 1225 (11th Cir. 2004).

In the instant case, the City of Lenexa, through the implementation of its zoning code on Plaintiff Shawnee Mission Church's Property, has made an "individualized assessment" of the proposed use of the Property involved.  The City looked at the zoning district where the Property

is located, evaluated the approved and conditional uses, and found that the proposed use of the Property as a homeless shelter was not, and could not be, an approved use. *Exhibit G.* Accordingly, it has made an individualized assessment of the Property.

The case law is clear that even where the government's regulation is neutral and generally applicable, its application to particular facts can constitute an individualized assessment, particularly where "the application does not involve a mere numerical or mechanistic assessment, but involves criteria that are at least partially subjective in nature." *Westchester Day School v. Village of Mamaroneck*, 417 F. Supp. 2d 477, 541-42 (S.D.N.Y., 20006), *aff'd,* 504 F. 3d. 338 (2d Cir. 2007). Again, in this case, the City Manager and the City Planner made a subjective determination that a homeless ministry is not an accessory use of the Church and that the use was not appropriate in a residentially zoned area. Plaintiff Shawnee Mission Church thus has established an "individualized assessment," under the substantial burden prong of RLUIPA.

> iv. **The manner in which the City imposed its land use regulations substantially burdened the Church's religious exercise.**

In *Rocky Mountain Christian Church v. Board of County Commissioners*, 612 F. Supp. 2d 1163 (10th Cir. 2009), the Court addressed the definition of the term "Substantial Burden," in the following manner:

> The term "substantial burden," as used in the RLUIPA, is to be interpreted by reference to the Religious Freedom Restoration Act (RFRA) of 1993, 42 U.S.C. §§ 2000bb through 2000bb-4. *Grace United Methodist Church v. City Of Cheyenne*, 451 F.3d 643, 661 (10th Cir. 2006). The RFRA purported to codify the test articulated by the Supreme Court in *Sherbert v. Verner*, 374 U.S. 398, 83 S. Ct. 1790, 10 L. Ed. 2d 965 (1963).
> In *Sherbert,* the Court invalidated a state unemployment compensation rule that conditioned the availability of benefits on an applicant's willingness to work under conditions forbidden by the applicant's religion. *Sherbert* was a member of the Seventh-day Adventist Church and was discharged by her employer because she would not work on Saturday, which was the Sabbath day of her faith. *Id.* at 399. State unemployment officials found that *Sherbert* was not qualified for unemployment benefits because her refusal to accept a job that required her to work on Saturday

amounted to a refusal to accept suitable work when offered. *Id.* The Supreme Court ruled that this finding violated *Sherbert's* free exercise rights:

> The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship.

*Id.* at 404. The Court held that governmental actions that substantially burden a religious practice must be justified by a compelling governmental interest. *Id.* at 403.

In 1990, the Supreme Court decided *Employment Division v. Smith*, 494 U.S. 872, 879, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990), in which the Court held that the Free Exercise Clause does not "relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" In *Smith,* the plaintiffs' religious use of peyote resulted in their dismissal from their employment. The state of Oregon concluded that the use of peyote was misconduct, and that this basis for dismissal from employment disqualified the plaintiffs from receipt of Oregon unemployment compensation benefits. The *Smith* Court refused to apply the *Sherbert* balancing test. *Smith*, 494 U.S. at 883-84. The Court noted that *Sherbert* and related cases involved systems of "individualized exemptions" that lent themselves to individualized governmental assessment of the reasons for a person's conduct. *Smith*, 494 U.S. at 884. The *Smith* Court concluded that *Sherbert* has been confined largely to the context in which it was decided, denial of unemployment compensation, and that the *Sherbert* rule does not apply to neutral laws of general applicability. *Smith*, 494 U.S. at 883 - 884.

In response to *Smith*, Congress enacted the RFRA. The RFRA purported to codify the Sherbert test and to apply that test to all government acts that "substantially burden" religious exercise, even if the burden results from a rule of general applicability. *City of Boerne v. Flores*, 521 U.S. 507, 515, 117 S. Ct. 2157, 138 L. Ed. 2d 624 (1997). In *City of Boerne*, the Supreme Court held that the RFRA was unconstitutional as applied to state and local governments. 521 U.S. at 532 - 536. RLUIPA was enacted in response to *City of Boerne* and, again, for the purposes of the RLUIPA, the term "substantial burden" is to be given the broad meaning used in RFRA and in *Sherbert*.

*Rocky Mountain Christian Church*, 612 F. Supp. 2d at 1170-71.

In *Holt v. Hobbs*, 135 S. Ct. 853 (2015), the Supreme Court held that prohibiting a prisoner from growing a beard was a "substantial burden" because it "seriously violates his religious beliefs." *Id*. Importantly, the Supreme Court in *Holt* stressed that RLUIPA's "substantial burden"

inquiry focuses only on the religious exercise being burdened and not on "whether the RLUIPA claimant is able to engage in other forms of religious exercise." *Id.* at 861. The Supreme Court held that it was error to even consider the alternative ways the prison had allowed the inmate to exercise his religion (a prayer rug, Islamic materials, a religious advisor, and Halal diet), because RLUIPA "provides greater protection" and asks only whether the government has substantially burdened a particular religious exercise (in *Holt*, the growing of a 1/2-inch beard). *Id.* at 862. The focus of the substantial burden analysis is to be on the particular religious exercise being restricted and not on the claimant's general ability to exercise his religion.

In this case, the religious exercise that is being burdened is housing the homeless. The case law clearly establishes that a religious entity's mission of housing the homeless is a "religious exercise" and the denial of the same is a "substantial burden." *Western Presbyterian Church v. Bd. of Zoning Adjustment*, 862 F. Supp. 538, 546-7 (D.D.C. 1994) (regulation of feeding program for homeless a "form of worship akin to prayer" and "a substantial burden on the free exercise of religion"); *The Jesus Ctr. v. Farmington Hills Zoning Bd. of Appeals*, 544 N.W.2d 698, 705 (Mich. 1996) (forcing a church to relocate its shelter program apart from its worship facility constituted a substantial burden and would detract from the mission of the church); *Harbor Missionary Church Corp. v. City of San Buenaventura,* 643 Fed. App'x 726 (9th Cir. 2016) ( substantial burden found through the denial of a homeless shelter); *First Lutheran Church v. The City of St. Paul*, Case No. 0:18-cv-00954-JRT-KMM, at p. 17 (D. Minn. July 2, 2018) (The church's partnership with a non-profit to provide housing for the homeless, "is a use of real property because [the church] permits [the nonprofit] to operate on church grounds, and that use is for the purpose of religious exercise because [the nonprofit] and [the church] together serve the homeless, the needy, and the poor in

myriad ways consistent with [the church's] mission and historical practice.") (attached as ***Exhibit H***).

In *First Lutheran Church v. The City of St. Paul*, Case No. 0:18-cv-00954-JRT-KMM (D. Minn. July 2, 2018) (attached as ***Exhibit H***), a case remarkably similar to the instant case, the church had partnered with a nonprofit day-shelter and community center to provide shelter for the homeless in the city. The church was soon informed that it needed to apply for permission to operate the shelter through an application for a Determination of Similar Use. The city initially approved the application with limited conditions for the church's operation of the shelter. However, neighboring property owners soon began complaining and ultimately appealed the approved Determination of Similar Use decision. That appeal resulted in the city imposing significantly more conditions on the church, including limiting the number of guests per day to just 20.

First Lutheran filed suit in federal court, alleging, among other things, that the conditions substantially burdened its religious exercise. In approving its request for injunctive relief, the court affirmed that the church's partnership with the nonprofit was a form of religious exercise, and specifically that the partnership, "is a use of real property because [the church] permits [the nonprofit] to operate on church grounds, and that use is for the purpose of religious exercise because [the nonprofit] and [the church] together serve the homeless, the needy, and the poor in myriad ways consistent with [the church's] mission and historical practice." *Id*. at p. 17. The court then looked at the meaning of substantial burden from other circuits and concluded, "a government regulation substantially burdens an exercise of religion when the regulation's effects go beyond being an inconvenience to a religious institution, and instead put substantial pressure on the institution to change that exercise." *Id*. at p. 18. Using this definition, the court ultimately held that

limitation of twenty (20) guests per day imposed a substantial burden on the church's religious exercise.

In making its holding, the court reflected on the fact that the church's mission and values were to be "welcoming to all individuals where they are regardless of their current economic, physical, mental, and social state," and that "[o]ver the last decade, [the church] has undertaken numerous steps in furtherance of its religious mission to assist the poor and homeless." *Id.* at p. 18 and p. 2, respectively.

In the instant case, Shawnee Mission Church has the same mission and heart to serve the homeless as First Lutheran. Pastor Rose Schwab's declaration confirms the same:

- Shawnee Mission Unitarian Universalist Church … is a religious community of people engaged in worship and the celebration of life, personal and intellectual growth, caring and supportive fellowship, humanitarian service and social action. *Exhibit A*, para. 4.

- Charity and service to those in need are integral parts of the Unitarian Universalist denomination. The UUA social mission is based on biblical principles, such as, *"When you reap the harvest of your land, moreover, you shall not reap to the very corners of your field nor gather the gleaning of your harvest; you are to leave them for the needy and the alien. I am the LORD your God."* Leviticus 23:22 and, *"Vindicate the weak and fatherless; Do justice to the afflicted and destitute. Rescue the weak and needy; Deliver them out of the hand of the wicked.*" Psalm 82:3-4, (N. Am. St. Bible). *Exhibit A*, para. 5.

- Continuously since its incorporation, Shawnee Mission Church has been a vibrant place of worship, growth and service to the purposes to the beloved community in the region. Church members believe that Jesus' ministry was, most powerfully, a minister to the poor. We believe that his actions all clearly call us to our most generous selves and that we are to live lives of service, as he did. They participate in these mission and outreach ministries actively, including serving Johnson County homeless residents and working with Project 10/20 to minister to the homeless in the local area. *Exhibit A*, para. 6.

- Shawnee Mission perceives its physical location to be a gift that has allowed the congregation to accomplish their sacred mission to create the beloved community; that is, to build a company of people to act as Jesus would to serve and shelter the people who are homeless. *Exhibit A*, para. 9.

- Shawnee Mission seeks to act as a moral force in the world and believe that ethical living is the supreme witness of religion. *Exhibit A*, para. 10.

- The principals and purpose of Shawnee Mission are consistent with the guiding principles from the Unitarian Universalist Association, found at https://www.uua.org/beliefs/what-we-believe/principles *Exhibit A*, paras. 10, 11.

In 2004, UU World: The Magazine of the Unitarian Universalist Association included "Elevator speeches" in their July/August publication, one of which explained that:

> Most Unitarian Universalists believe that nobody has a monopoly on all truth, or ultimate proof of the truth of everything in any one belief. Therefore, one's own truth is unprovable, as is that of others. Consequently, we should respect the beliefs of others, as well as their right to hold those beliefs. Conversely, we expect that others should respect our right to our own beliefs. Several UU's then, would likely hold as many different beliefs. **Other beliefs they may hold in common are a respect for others, for nature, and for common decency, leading to a particular caring for the poor, the weak and the downtrodden.** As a result, issues of justice, including social justice are held in common among most.[2]

The commitment to serve the homeless is an essential part of many other Unitarian Universalist Churches throughout the United States. Several UU churches across America have opened their church doors to the homeless.

- **Unitarian Universality Fellowship of Huntington, New York**
  - HIHI, the Huntington Interfaith Homeless Initiative, is a Huntington-wide effort to address homelessness in the community. Through the efforts of HIHI, nightly food and shelter are provided at Huntington houses of worship, during the colder months of December through March.[3]

- **Quimper Unitarian Universalist Fellowship, Port Townsend, Washington**
  - As of July 2018 the church committed to supporting a year round shelter. For 6 months the church shelters about 33 homeless men and women between 4pm and 8am each day.[4]

- **Jefferson Unitarian Church, Colorado**
  - Since 2002 the Jefferson Unitarian Church in Golden, **Colorado,** has been offering shelter, meals, friendship, and encouragement to families who are temporarily homeless, as part of the Interfaith Hospitality Network of Greater

---

[2] Accessed at: http://archive.uuworld.org/2004/04/. Emphasis added.
[3] Accessed at: https://www.uufh.org/faith-in-action/hihi/
[4] Accessed at: https://www.quuf.org/jc-shelter/.

Denver. The church provides overnight lodging and meals for up to 14 guests for one week about every three months.[5]

- **The Unitarian Universalist Church in Cambridge, Massachusetts**
   o In 2005, the UUC in Cambridge, in partnership with Y2Y Harvard Square, opened a shelter in the church's basement for the city's homeless youth, providing rooms for 20 overnight guests, ages 18-24, as well as dinner and breakfast.[6]

- **Woodinville Unitarian Universalist Church, Washington**
   o On August 19, a traveling homeless encampment called Tent City 4 (TC4) moved to the Woodinville Unitarian Universalist Church in Washington for a three-month stint. The encampment takes up less than 5,000 square feet in the church parking lot and is not visible from the street, the Rev. Alex Holt said. The church provides electrical power, water, food, and transportation, and TC4 organizers provide portable showers, toilets, and heaters.[7]

- **UUC of Delaware County, Pennsylvania**
   o The congregation hosts homeless families 4-5 weeks a year as part of the Family Promise Delaware County program, a faith-based program involving 10 congregations in Delaware County. Three or four families spend a week at the church.[8]

- **Unitarian Universalist Church of Concord, New Hampshire**
   o The local Interfaith Hospitality Network consist of several area churches that make up Family Promise of Greater Concord. Members of the Concord Unitarian Universalist Church host homeless families at the church one week at a time, three to four weeks a year. Members of the church provide meals and overnight hospitality.[9]

- **First Unitarian Portland**
   o In 2017, First Unitarian Portland agreed to extend its daytime family shelter to host families overnight in the winter. Beginning sometime in November and continuing through the winter, the church welcomes families to spend the night in their "Undercroft," (the area adjacent to the daytime family shelter).[10]

- **First UU Church of San Diego, California**
   o From December 16-30 the First UU Church of San Diego will provide shelter for and meals for 12 guests. The Common Room and Room 113 will be their home during that time. This is one important way this congregation acts on their values.

---

[5] Accessed at: https://www.uuworld.org/articles/uus-join-interfaith-efforts-shelter-homeless.
[6] Accessed at: https://www.uuworld.org/articles/cambridge-church-will-host-shelter.
[7] *Id.*
[8] Accessed at: https://www.uucdc.org/justice/community-service/.
[9] Accessed at: https://concorduu.org/faith-in-action/homelessness-outreach/.
[10] Accessed at: https://www.firstunitarianportland.org/shelter/.

Volunteers provide evening meals, serve as overnight hosts, and help coordinate bedding, organize laundry, shop for food and supplies and set-up/clean-up of the shelter.[11]

- **Edmonds Unitarian Universalist Congregation, Edmonds Washington**
  o EUUC provides ten spaces in their parking lot for homeless individuals in the neighborhood who are living in their cars.[12]

Similar to the *First Lutheran* case, Shawnee Mission Church's mission and values are "welcoming all individuals where they are regardless of their current economic, physical, mental, and social state," and that "[o]ver the last decade, [the church] has undertaken numerous steps in furtherance of its religious mission to assist the poor and homeless." *First Lutheran Church,* at p. 18 (attached as *Exhibit H*).

At the present time, there are no homeless shelters for single male adults in Johnson County. *Exhibit A,* para. 17. There is one shelter with four (4) beds for homeless single adult women. *Id.* There are 189 homeless adults in Johnson County. *Exhibit C.* There has been a 13% increase in homeless in the county over the past year; the median age of the homeless is 32 (up from 15 years old in 2015) and about 80% of those counted were in adult only households. *Exhibit A,* para. 18; *Exhibit C.* Last winter, in 2019, there were 240 homeless individuals in Johnson County served by a temporary housing group called Project 10/20. *Exhibit A,* para. 19; *Exhibit C.* Pastor Schwab is aware of an increase of people asking the Church for help as they are either homeless or home insecure (meaning, will be homeless soon) and she has personally been asked by people who live in Johnson County for financial, grocery, medical and housing support. *Exhibit A,* para. 20.

---

[11] Accessed at: http://www.firstuusandiego.org/first-uu-hosts-interfaith-homeless-shelter.
[12] Accessed at: https://euuc.org/justice/serving-our-community/homelessness/.

As mentioned above, the Property is the only option for the proposed homeless shelter. There simply is no other shelter and no alternative property for the shelter in Johnson County, Kansas. While the weather continues to freeze every night, nearly 200 people will needlessly suffer and likely be harmed if the illegal denial of the rights of Shawnee Mission Church to use its property to house the homeless is allowed to stand. *Exhibit A,* para. 36. As a result of the City's denial of Shawnee Mission Church's request, the Church is effectively barred from using its Property for its religious ministry. More to the point, it has substantially burdened the religious exercise of the Church and the shared ministry opportunities it afforded, which were, first and foremost, an affirmation from God for the congregation and the work they have done previously in furtherance of the Church's lifelong mission to serve those experiencing homelessness and poverty. *Exhibit A,* para. 37. Therefore, to have the City threaten the mission of the Church is a wrongful attempt to take away God's favor and affirmation of service and an attempt to limit the religious freedoms of the Church.

Ultimately, it is without question that the City has substantially burdened Shawnee Mission Church's religious exercise through its decision to prevent the Church's ministry to the homeless.

> ### v. *The City does not have any compelling government interests to justify imposing the substantial burden.*

Once the Court finds a municipality's actions impose a substantial burden on religious exercise, the burden shifts to the municipality to prove imposing the substantial burden furthers a compelling governmental interest and is the least restrictive means of furthering that interest. *See* 42 U.S.C. § 2000cc(a)(1); 42 U.S.C. § 2000cc-2(b). Compelling interests are "interests of the highest order." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 546 (1993). Such interests include protecting public health, safety or welfare. *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972). "Demonstrating a compelling interest and showing that it has adopted the least restrictive

means of achieving that interest is the most demanding test known to constitutional law." *City of Boerne v. Flores,* 521 U.S. 507, 534 (1997). The standard "is not watered…down but really means what it says." *Lukumi*, 508 U.S. at 546. Thus, the government must "show a compelling interest…in the particular case at hand, not a compelling interest in general." *Westchester*, 504 F.3d at 353.

While the City may assert a general interest in protecting the health and safety of its residents, such an assertion is inadequate because the City must show a compelling interest "in the particular case at hand." *Id*. In this case, the City has simply and clearly failed to do so. Instead, the City's asserted interests are purely abstract and certainly not "interests of the highest order" that justify restricting the Church's religious exercise. *Lukumi*, 508 U.S. at 546. As the Supreme Court held in *Lukumi*, "where government restricts only conduct protected by the First Amendment and fails to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort, the interest given in justification of the restriction is not compelling." *Id*.

In this case, the City suggests that the use of the Property as a homeless shelter is "inconsistent" with the residential zoning designation of the Church. **Exhibit G.** This argument ignores the reality of the land.

The subject Property, a former elementary school, is not located in a typical residential area. Rather, it is located adjacent to mostly commercial and office uses. As shown in the Google Map attached as **Exhibit D,**

- To the South of the Church is a large empty field adjacent to Crown Lift Trucks and offices for Catapult International, Barber Financial and American Family Insurance;

- To the East of the Church is the Lenexa Masonic Lodge 135, Lenexa Community Center; Lenexa Senior Center, Carter's Antiques, Alterations by Heidi, Autism from the Start *(all in former residential homes)* and the Cat Clinic of Johnson County;

- To the North of the Church is a rail line; Jerry's Bait Shop, and Lenexa Smoke store;

- To the West of the Church is a dual train line, a large field, and Santa Fe Trail Drive.

Indeed, there is but one residential home in the surrounding area – the remaining adjoining uses are all office, retail and commercial uses. *See Exhibit D*. To suggest that the use of the Property for a homeless shelter is "inconsistent" with the residential use of the property in the surrounding area is clearly a red herring and ignores the actual characteristics of the area in which the Property sits.

In light of the fact that the Property is no longer truly residential, the City has failed to demonstrate a compelling interest in denying Shawnee Mission Church the ability to use its Property for a homeless shelter.

   *vi.*   ***The City did not use the least restrictive means to deny the use.***

Even if the City could show a compelling interest, it must also show it employed the least restrictive means of furthering that interest. 42 USC § 2000cc(a)(1)(B). The least restrictive means requirement is even more stringent than strict scrutiny's narrow tailoring requirement. *Bd. of Trs. v. Fox*, 492 U.S. 469, 477-78 (1989). The municipality must show "[there are] no alternative forms of regulation" that would further its purported interests. *Sherbert v. Verner*, 374 U.S. 398, 407 (1963). "If a less restrictive means is available for the Government to achieve its goals, the Government ***must*** use it." *U.S. v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 815 (2000) (emphasis added). The City has an obligation to produce actual evidence its actions were the least restrictive possible actions it could have taken to further its interests in this case. *Fegans v. Norris*, 537 F.3d 897, 904 (8th Cir. 2008).  Defendant will not be able to do so here, because  there was ***no*** attempt

to enact any less restrictive means before denying the proposed homeless shelter on Shawnee Mission Church's Property.

Representatives from the Church and City met on November 5, 2019 at 4:00 p.m. at the City Hall, after the denial letter was sent, to see if there was any possible way the issue could be resolved. *Exhibit A*, para. 32. During the course of that meeting, representatives from the Church and Project 10/20 sought clarification from the City as to why they changed their position from the meeting of October 14, 2019, during which they indicated that the shelter was in compliance with zoning and building ordinances. *Exhibit A*, para. 33.

City Manager Beccy Yocham spoke and acknowledged that serving the homeless was an issue, that the determination of whether serving the homeless is subjective as to whether it was an accessory use under the zoning code, and that it was her sole discretion to deny the Church the proposed accessory use as a "homeless shelter." *Id*.

When asked by representatives of the Church if the building could be used for emergency shelter for a tornado or other weather or civic events, City Manager Beccy Yocham agreed that it could be used for that situation. However, she insisted that the use of the property for a "homeless shelter" was not permitted. *Id.*, para. 34.

Representatives of the Church then offered the City various proposals, including, agreeing to limit the number of guests who would stay overnight inside the Church building.  *Id,* para. 35. The City Manager rejected every proposal from the Church and simply stated that the City would not grant a special permit to allow the Church to be used for a homeless shelter. *Id*.

Clearly there were alternative forms of regulation available to the City. As such, the City "must use" the less restrictive means. *Playboy*, 529 U.S. at 815. But it failed to do so, and as a result the City necessarily did not use the least restrictive means of furthering its interests. Because

Shawnee Mission Church can establish that Defendant has substantially burdened Shawnee Mission Church's religious exercise, and did so without a compelling governmental interest and without narrowly tailoring the restrictions to fulfill the governmental interest, Shawnee Mission Church is likely to succeed on the merits of its Substantial Burden RLUIPA claim and is, accordingly, entitled to injunctive relief.

### 2.    *The Church Will Suffer Irreparable Harm Without a Preliminary Injunction.*

It is well settled that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). RLUIPA was specifically established to enforce religious freedoms provided by the First Amendment. 146 CONG. REC. S7775–76 (daily ed. July 27, 2000). *See also Murphy v. Zoning Comm'n of the Village of New Milford*, 148 F.Supp.2d 173, 180-81 (D. Conn. 2001) ("Since [RLUIPA] was enacted for the express purpose of protecting First Amendment rights of individuals, the allegation that the defendants have violated this statute also triggers the same concerns that led the courts to hold that these violations result in a presumption of irreparable harm.") (citations omitted).

Because Shawnee Mission Church has demonstrated a likelihood of success on the merits of its claims, it has established it will suffer irreparable harm without injunctive relief, thereby weighing in favor of injunctive relief.

### 3.    *The Requested Preliminary Injunction Will Not Cause Substantial Harm to Others.*

If the injunction does issue, the City will simply be forced to comply with RLUIPA and the U.S. Constitution. This can hardly be deemed a hardship. *See Vietnamese Buddhism Study Temple in Am. v. City of Garden Grove*, 460 F.Supp.2d 1165, 1173 (C.D. Cal. 2006) (wherein the court issued a preliminary injunction and found that "[t]he City is only required to make the limited

accommodations necessary to allow the Temple and its congregation to engage in some meaningful religious activity at the…property. The impact of the injunction on the City's police power is minimal, particularly in comparison to the seriousness of the harm the Temple and its congregants suffer through the denial of their First Amendment rights. The balance of the hardships thus clearly tips in favor of the Temple.").

To the contrary, if an injunction does not issue, the City will continue violating the Church's rights, and the rights of all religious assemblies, by enforcing and implementing the facially unconstitutional Zoning Code provision. This would undoubtedly deprive the Church of its protected interests.   Accordingly, the balance of hardships tips in favor of issuing the preliminary injunction.

### 4.   The Public Interest Will Be Served by the Requested Preliminary Injunction.

A party seeking a preliminary injunction is not required to show that the requested injunctive relief will serve the public interest; rather, it must show the issuance of the injunction would not be adverse to the public interest. *Heideman v. South Salt Lake City*, 348 F. 3d 1182, 1188 (10th Cir. 2003); *Kikumura v. Hurley*, 242 F. 3d 950, 955 (10th Cir. 2001). To that end, this case has the potential to touch the lives of hundreds of members of the public who would be adversely impacted if the City's refusal to allow Shawnee Mission Church to exercise its religious beliefs is not enjoined. Unfortunately, winter isn't just coming, it is already here. And with it are severe consequences for those who are unable to find shelter from the cold. Protecting Shawnee Mission Church's religious mission to serve the needy by issuing a temporary restraining order and a preliminary injunction benefits these members of the public more than words can describe. It goes without saying that the public interest is served by the granting of the injunctive relief as requested herein.

In addition, the public interest is always served by preventing a violation of constitutional rights. *Chabad of South Ohio and Congregation Lubavitch v. City of Cincinnati, Ohio,* 363 F. 3d. 427 (6th Cir. 2004).  "[I]t is always in the public's interest to prevent violation of a party's rights." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville and Davidson Cty., Tennessee*, 274 F.3d 377, 400 (6th Cir. 2001).  "Vindicating First Amendment freedoms is clearly in the public interest." *Pacific Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005). "[I]f a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *AT&T v. Winback & Conserve Program, Inc*., 42 F.3d 1421, 1427 n.8 (3d Cir. 1994). Further, "the public interest is best served by enjoining a statute that unconstitutionally impairs First Amendment rights." *Forum for Acad. & Inst. Rights v. Rumsfeld*, 390 F.3d 219, 246 (3d Cir. 2004).

Here, the public interest will be served through the issuance of an injunction as it would prevent any further violation of Shawnee Mission Church's rights under RLUIPA and the U.S. Constitution.

## CONCLUSION

As set forth above, all of the factors weigh in favor of granting injunctive relief. Accordingly, Plaintiff Shawnee Mission Church respectfully requests that the Court grant its Motion for Temporary Restraining Order or, in the alternative, a Preliminary Injunction to enjoin Defendant from improperly using zoning decisions that effectively eradicate Shawnee Mission Church's ministry to those in need.

Dated:  November 22, 2019

Respectfully Submitted,

**SHOOK, HARDY BACON L.L.P.**

By: *B. Trent Webb*
B. Trent Webb (D. Kan. No. 15965)
Beth Larigan (D. Kan. No. 20169)
2555 Grand Blvd.
Kansas City, MO 64108
Tel. (816) 421-6550
bwebb@shb.com
blarigan@shb.com

**Dalton & Tomich PLC**

By: *Daniel P. Dalton*
Daniel P. Dalton (Michigan Bar No. 44056)
Alexander R. Reuter (Michigan Bar No. 80654)
Lead Attorneys for Plaintiff
*Pro Hac Vice* admissions pending
The Chrysler House
719 Griswold Street, Suite 270
Detroit, MI  48226
Tel. (313) 869-6000
ddalton@daltontomich.com
areuter@daltontomich.com

*Attorneys for Plaintiff*
*SHAWNEE MISSION UNITARIAN*
*UNIVERSALIST CHURCH*